UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KEVIN CARTER | : | Civil No. 3:07CV1477 (EBB) |
| | : | Criminal No. 3:04CR174(EBB) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | June 14, 2010 |

## UNITED STATES' RESPONSE TO DEFENDANT'S SUPPLEMENTAL PRO SE MOTIONS PURSUANT TO 28 U.S.C. § 2255

On January 21, 2005, following a four-day trial, and three days of deliberations, a federal jury found the defendant, Kevin Carter ("Carter"), guilty beyond a reasonable doubt on all counts of a three count superseding indictment charging him with: (1) Hobbs Act Robbery, in violation of 18 U.S.C. § 1951; (2) Using and Carrying a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A); and (3) being a Convicted Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g). On April 13, 2005, this Court denied Carter's motion for judgment of acquittal. On May 2, 2005, this Court sentenced the defendant to 240 months' imprisonment on Count One, a consecutive term of 84 months' imprisonment on Count Two and a term of 360 months' imprisonment on Count Three, to run concurrent to the sentences on Counts One and Two. On March 27, 2006, the United States Court of Appeals for the Second Circuit affirmed the Court's judgement of conviction.

On October 5, 2007, the defendant filed a pro se motion to vacate, set aside, and correct his conviction and sentence pursuant to Title 28, United States Code, § 2255 ("Section 2255"). On December 17, 2008, the defendant filed a motion to supplement his Section 2255 motion and on January 7, 2008, filed a second motion to supplement his Section 2255 motion. On April 24, 2008, the Government filed a response to the defendant's motions. On May 28, 2008, the

defendant filed a traverse to the Government's response.  On July 14, 2008, the Court issued a ruling and denied the defendant's Section 2255 motion.

On July 29, 2008, the defendant filed a motion for leave to supplement the defendant's Section 2255 motion and, on that same date, filed a motion for reconsideration of the defendant's Section 2255 motion.  On February 2, 2009, the defendant filed a second post-ruling motion to supplement his Section 2255 motion.  On August 20, 2009, the Government filed a response to the defendant's supplemental Section 2255 motions.  On September 10, 2009, the defendant filed a traverse to the Government's response.

By his post-ruling supplemental motions, the defendant alleges that his June 10, 1984 conviction for Robbery 3rd Degree, his August 11, 1988 conviction for Risk of Injury to a Minor, his January 2, 1992 conviction for Sale of Illegal Drugs and his January 25, 1994 conviction for Possession with Intent to Sell Narcotics are not predicate offenses for purposes of establishing that the defendant is a "career offender" pursuant to U.S.S.G. § 4B1.1 or an "armed career criminal" pursuant to 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4.   In addition, the defendant argues that his counsel, Norman Pattis, Esq., was ineffective for failing to argue that these convictions are not predicate offenses for purposes of establishing that the defendant is a "career offender" or an "armed career criminal."

On May 20, 2010, the Court ordered the Government to submit additional materials in response to the defendant's supplemental motions.  This memorandum is submitted in response to that Order.  For the reasons stated below, the petitioner's claims are without merit and should be denied.

2

## I.   FACTUAL BACKGROUND

### A.   The Robbery.

On March 20, 2003, at approximately 8:00 p.m., defendant Kevin Carter and another man entered the Harstan's Jewelry Store on South Main Street in West Hartford, Connecticut.  Both men were wearing ski masks, each carried a revolver, and one of the thieves carried what appeared to be a stun gun.

Carter and the other robber forced three employees, at gun point, to lie on the ground behind a counter.  All three employees testified at trial, and all three made clear that they believed their lives were at risk during the robbery.  One of the employees, Jean Zell, testified that at one point one of the robbers put a tray of jewels on her back, due to the lack of available counter space.  Carter and his confederate left the jewelry store within approximately ten minutes.

Before leaving the jewelry store, one of the thieves took wallets from two of the three employees, Michael Turgeon (the store manager) and Vito Sagbay.  In the course of the robbery, the thieves had repeatedly asked the employees about the location of video surveillance tapes. When the employees told the robbers that there were no such videotapes, the robbers indicated that they were taking the wallets so they would know where the employees lived, in the event that videotapes surfaced in the future.  The thieves took jewelry, including Rolex watches, diamonds, and other jewelry, with a total retail value in excess of $573,500.

### B.   Events at the ATM in Springfield, Massachusetts.

That same night, at approximately 10:00 p.m., two of the bank cards that had been owned by one of the robbery victims, Michael Turgeon, were used in five separate attempts to withdraw

money from an automated teller machine ("ATM") at the Bank of Western Massachusetts in Springfield, Massachusetts.  Investigating officers obtained the ATM videotape that corresponded with the attempted transactions.  That videotape revealed an adult male, wearing a ski mask and a Timberland baseball hat, approaching the ATM on March 20, 2003, between 10:02 p.m. and 10:04 p.m.  Bank records confirmed that the man in the ski mask was attempting to use two of Michael Turgeon's bank cards.  See Government's Exhibit ("GX") 17B.  The evidence at trial confirmed that it takes approximately 30 minutes to travel from West Hartford, Connecticut, to Springfield, Massachusetts.

### C.     Search of Carter's Vehicle and Residence.

Several weeks after the Harstan's robbery in West Hartford, a jewelry store in Avon, Connecticut, was robbed by two men, both of whom were wearing ski masks and carrying firearms.  That robbery was recorded on surveillance videotape, and the videotape was broadcast on local news stations.  Following the broadcast, local authorities were contacted by an anonymous caller who stated that he/she recognized one of the individuals in the robbery, despite the ski mask, as Kevin Carter, who was also known to the caller as "Black."

In June 2003, Windsor Police believed that Kevin Carter, who was also known to them by the street name "Black," was living at 98 Longview Drive in Windsor, Connecticut.  On June 3, 2003, Windsor Police received a Failure to Appear warrant for Kevin Carter.  Equipped with that warrant, the Windsor Police set up surveillance at 98 Longview Drive on June 4, 2003, shortly after 7:00 a.m.  Within a matter of minutes, the defendant's wife, Sarah Carter, departed from the Longview Drive address.  Almost two hours later, Kevin Carter also left, driving a car registered to Sarah Carter.

4

Police officers stopped the car that Kevin Carter was operating, placed him under arrest pursuant to the Failure to Appear Warrant, and began an inventory search.  One of the officers found a marijuana cigarette in the ashtray of the vehicle and, thereafter, searched the remainder of the vehicle.  In the rear cargo area of the car, an officer located a Harstan's jewelry store shopping bag, made of paper.  Inside that bag were three plastic bags, one inside the other, and also carrying the name "Harstan's Jewelry Store." Officers found a Waterford crystal clock inside the third plastic bag.  The manager of the Harstan's jewelry store came to the Windsor Police Department where he identified the Waterford clock as one of the items that had been stolen in the robbery on March 20, 2003.

Based on the seizure of the clock, the police obtained a search warrant for Carter's house from a judge of the Connecticut Superior Court.  The officers then searched the 98 Longview Drive residence and found the following evidence: a silver colored revolver, with 20 rounds of ammunition; various bank cards and business cards that belonged to victims of the Harstan's robbery; a business card from Canaly Buyers, a New York City diamond-district merchant; and a Timberland baseball hat.

**D.     The Trial Evidence.**

The three robbery victims testified that both robbers had guns.  Michael Turgeon described the gun that had been used as a silver colored "cowboy gun," that is, a revolver.  Vito Sagbay, another employee, stated that the gun that he saw was "white."  He said that when the gun was pointed at him, he was able to see the bullets in the chamber.  Sagbay also testified that one of the robbers wore a green jacket.  Michael Turgeon testified that the gun, GX 2A, looked "exactly" like the gun that had been used in the robbery.

5

A representative from Paramount Headwear, a manufacturing company that manufactured baseball hats for the Timberland Company, testified that there were only about 3,302 Timberland baseball hats distributed in the United States that matched the hat found in the Carter residence. An FBI analyst, who testified as an expert witness at trial, identified characteristics on the Timberland baseball hat seen in the ATM videotape that corresponded to the Timberland baseball hat found in the Carter residence.

Records from the Mohegan Sun casino in Montville, Connecticut, indicated that Kevin Carter appeared at the Mohegan Sun Casino at 11:32 p.m. on March 20, 2003.  See GX 36B. Windsor police Sergeant Christopher McKee testified that he drove the distance from the Springfield ATM to the Mohegan Sun Casino in about an hour and 13 minutes.  Thus, the jury could conclude that it was quite possible to travel from the Springfield ATM machine after the ATM transaction was concluded (at 10:04 p.m.) and arrive at the Mohegan Sun Casino, as did Kevin Carter, at 11:32 p.m.

A Mohegan Sun Casino employee, Henry Graffeo, testified regarding records of Kevin Carter's gambling on the evening of March 20, 2003.  Those cards, including GX 36B, make reference to Kevin Carter as a black male who, in the eyes of various dealers, was seen that night wearing a Timberland hat and a green jacket on the night of the Harstan's robbery.

Gary Kakorev, who had owned a jewelry operation in New York City between 2001 and late 2003, testified about the diamond merchant business card that had been located in the course of the June 4, 2003, search of Carter's house.  See GX 22.  Kakorev identified the card as one that he had distributed from his business, Canaly Buyers.  The back of this particular Canaly Buyers business card bore the notation "10,000."  Kakorev testified that he had written the figure

"10,000" on the back of the card, and that it was the type of notation that he might make if someone had requested an appraisal from him, or perhaps a retail or wholesale sale estimate of a particular item.  Kakorev testified that he might also make such a notation if someone inquired as to how much Kakorev would pay to purchase a particular object.

The Government also introduced the testimony of Charles Devorce, who was incarcerated with Carter immediately following Carter's June 12, 2003 arrest.  Devorce testified that Carter, who he knew as "Black," had admitted to him that Carter had had possession of a clock from the jewelry store because he was going to give it to his mother.  Devorce, when asked if Carter had told him where any of the items from the jewelry store had gone, testified that Carter had fenced the items through a man who, in turn, was to fence the goods to Europe.

**E.     Evidence of Carter's Sudden Acquisition of Cash.**

Through Mr.  Graffeo, and Joseph Perry, a witness from the Foxwoods Casino in Ledyard, Connecticut, the Government established that Kevin Carter engaged in regular gambling at both the Foxwoods and Mohegan Sun Casinos.[1]  However, those records also showed that Kevin Carter's gambling activity steadily diminished in the year 2003, at both casinos, until a point almost immediately after the robbery.  After the robbery, Kevin Carter appeared at both casinos with significant funds and proceeded to gamble with those funds, losing money overall, at both casinos.  Government Exhibits 44 and 45 reflect that gambling history.  A witness from the Connecticut Department of Labor testified that Kevin Carter did not appear to

---

[1]Perry testified that, over an eleven-year period, Carter had bought chips at the Foxwoods Casino on 147 occasions, betting a total of over $70,000.  See GX 37A.  Graffeo testified that, during the two-year period prior to Carter's arrest on June 12, 2003, Carter bought chips on 188 occasions, losing more than $17,000 overall.

have any record of employment, at least insofar as the Connecticut Department of Labor was aware.

Kevin Carter opened a savings account on March 29, 2003, using a $5,000 cash deposit to open the account.  Carter cleaned out the account between June 5 and June 10, 2003.  The evidence established that when Carter opened the account, he did so using his son's Social Security number.

## II.    DISCUSSION

### _____A.    Governing Legal Principles

To obtain collateral relief under 28 U.S.C. § 2255, the petitioner must show that his "sentence was imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255.  Habeas corpus relief is an extraordinary remedy and should only be granted where it is necessary to redress errors which, were they left intact, would "inherently result in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962).  The strictness of this standard embodies the recognition that collateral attack upon criminal convictions is "in tension with society's strong interest in [their] finality."  Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995).  See also Strickland v. Washington, 466 U.S. 668, 693-94 (1983) (recognizing the "profound importance of finality in criminal proceedings.").  "As a general rule, 'relief is available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'"  Napoli, 32 F.3d at 35 (quoting Hardy v. United States, 878 F.2d 94, 97 (2d Cir. 1989)) (internal quotations and citations omitted).  Constitutional errors will not be corrected through a writ of habeas corpus unless they have had a "substantial and injurious

8

effect," that is, unless they have resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 623, 637-38 (1993); see also Underwood v. United States, 166 F.3d 84, 87 (2d Cir. 1999) (applying Brecht to section 2255 petition).

Furthermore, a habeas petitioner must not have procedurally defaulted his claims by failing to raise them at trial and on direct appeal.  For a court to review procedurally defaulted claims, the petitioner must show both "cause" for the default of each claim and "prejudice" that resulted from the alleged violation.  See Ciak, 59 F.3d at 302 (quoting Wainwright v. Sykes, 433 U.S. 72, 87 (1977)).  A writ of habeas corpus will not be allowed to do service for an appeal.  See Reed v. Farley, 512 U.S. 339, 354 (1994) ("Where the petitioner–whether a state or federal prisoner–failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice from the alleged . . . violation.'") (quoting Wainwright, 433 U.S. at 84); Douglas v. United States, 13 F.3d 43, 46 (2d Cir. 1993) (same).

The rule of procedural default can be overcome only in narrow circumstances.  One such circumstance is where the petitioner shows that his counsel's performance was constitutionally ineffective.  See Murray v. Carrier, 477 U.S. 478, 487-88 (1986).  A person challenging his conviction on the basis of ineffective assistance of counsel bears a heavy burden.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  The ultimate goal of the inquiry is not to second-guess decisions made by defense counsel; it is to ensure that the judicial proceeding is still worthy of confidence despite any potential imperfections, as "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has

9

on the ability of the accused to receive a fair trial."  Roe v. Flores-Ortega, 528 U.S. 470, 482

(2000) (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)).

In Strickland, the Supreme Court held that a defendant must establish (1) that his

counsel's performance "fell below an objective standard of reasonableness" and (2) that

counsel's unprofessional errors actually prejudiced the defense.  Id. at 688.

> To satisfy the first, or "performance," prong, the defendant must show that
> counsel's performance was "outside the wide range of professionally competent
> assistance," [Strickland, 466 U.S.] at 690, and to satisfy the second, or
> "prejudice," prong, the defendant must show that "there is a reasonable
> probability that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different," id. at 694.

Brown v. Artuz, 124 F.3d 73, 79-80 (2d Cir. 1997).  A defendant must meet both requirements of

the Strickland test to demonstrate ineffective assistance of counsel.  If the defendant fails to

satisfy one prong, the Court need not consider the other.  See Strickland, 466 U.S. at 697.  "The

Strickland standard is rigorous, and the great majority of habeas petitions that allege

constitutionally ineffective counsel founder on that standard."  Linstadt v. Keane, 239 F.3d 191,

199 (2d Cir. 2001).  "The court's central concern is not with 'grad[ing[ counsel's performance,'

but with discerning 'whether, despite the strong presumption of reliability, the result of the

particular proceeding is unreliable because of a breakdown in the adversarial process that our

system counts on to produce just results.'"  United States v. Aguirre, 912 F.2d 555, 560 (2d Cir.

1990) (quoting Strickland, 466 U.S. at 696-97) (internal citations omitted).

To establish ineffective assistance of appellate counsel, a petitioner must establish the

same two-part test announced in Strickland, i.e., that appellate counsel's representation was

deficient and that the petitioner suffered prejudice as a result of his counsel's deficient

performance.  See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citing Strickland, 466 U.S. at 687).  "In attempting to demonstrate that appellate counsel's failure to raise a . . . claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made."  Id. (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)).  "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Id.  "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' . . . and may not use hindsight to second-guess his strategy choices."  Id. (quoting Strickland, 466 U.S. at 690).  "Counsel is not required to forecast changes in the governing law."  Id.

"The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed de novo" by an appellate court.  See United States v. Hernandez, 242 F.3d 110 (2d Cir. 2001) (internal quotation marks omitted).

**B.     The Petitioner's Sentencing Guidelines Were Calculated Properly.**

In this case, the Pre-Sentence Report ("PSR") correctly determined, under the procedures in place at that time, that the defendant was a  "career offender" pursuant to U.S.S.G. § 4B1.1.  The defendant was correctly determined to be a "career offender" because he was more than 18 years of age at the time he committed the offense of conviction, the instant offense of conviction was a felony that is a "crime of violence" and the defendant had at least two prior felony

convictions for either a "crime of violence" or a "controlled substance offense."  See U.S.S.G. § 4B1.1(a).

Specifically, as set forth in the PSR, the defendant was convicted of Risk of Injury to a Minor (i.e., Conn. Gen. Stat. 53-21) on August 11, 1988 and was sentenced to 5 years in jail, execution suspended after 18 months, and 5 years probation.  See PSR ¶ 38.  As set forth in the PSR, the defendant and his associates picked-up a fifteen year-old female victim, lured her into the defendant's vehicle and then lured her into "an attick type room on the third floor" of 64 Cabot Street in Hartford, by telling her that there was a bathroom up there.  See id.  The defendant and his associates dragged the victim over to a mattress, where the defendant held her down, while his associate "put his penis in her vagina" and had intercourse with her.  See id. When the defendant's associate finished, "the defendant got on top of the victim, and put his penis in her vagina and had [] intercourse with the victim."  See id.  This crime plainly involved "the use, attempted use, or threatened use of physical force against the person of another" and is therefore a "crime of violence" under U.S.S.G. § 4B1.2(a).

As also set forth in the PSR, the defendant had five prior narcotics convictions, including the following: (1) a January 2, 1992 conviction for Sale of Hallucinogens/Narcotics (i.e., Conn. Gen. Stat. § 21a-277(a)), for which the defendant was sentenced to 10 years jail, 5 years to serve and 5 years probation; and (2) a January 25, 1994 conviction for Sale of Hallucinogens/ Narcotics (i.e., Conn. Gen. Stat. § 21a-277(a)), for which the defendant was sentenced to 10 years jail, 5 years to serve and 4 years probation.  See PSR ¶¶ 40, 43.  As stated in the PSR, the police report for the January 2, 1992 Sale of Hallucinogens/Narcotics conviction was no longer available.  See PSR ¶ 40.  As to the January 25, 1994 Sale of Hallucinogens/Narcotics

conviction, the police report indicated that police officers seized from the defendant's home 36 grams of cocaine with an estimated street value of $3,000, a scale, packaging material, material to cut/dilute cocaine, approximately $500 in cash and three loaded semi-automatic handguns. See PSR ¶ 43.  In short, under the procedures in place at the time of the defendant's sentencing for determining whether an offense constituted a controlled substance offense, the PSR correctly determined that the January 25, 1994 Sale of Hallucinogens/Narcotics conviction was a "controlled substance offense" under U.S.S.G. § 4B1.2(a) and, as a result, the defendant was in fact a career offender under U.S.S.G. § 4B1.1.

Because the defendant was convicted of 18 U.S.C. § 924(c) and the defendant was a career offender, the defendant's sentencing guidelines range was properly calculated under U.S.S.G. § 4B1.1(c)(3).  The PSR correctly determined that the defendant's guideline range under U.S.S.G. § 4B1.1(c)(3) was 360 months' to life imprisonment.[2]  See PSR ¶ 93.

In addition, the PSR correctly determined, under the procedures in place at that time, that the defendant was an "armed career criminal" pursuant to 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4.  The PSR correctly determined that the defendant was an "armed career criminal" because the defendant was convicted of violating 18 U.S.C. § 922(g) and he had three prior convictions for either a "violent felony" or a "serious drug offense."  See 18 U.S.C. § 924(e).  As discussed above, the defendant's conviction for Risk of Injury to a Minor plainly involved "the

---

[2]In addition, U.S.S.G. § 2K2.4 is applicable to violations of 18 U.S.C. § 924(c)(1)(A) (i.e., Count Two).  Subsection 2K2.4(c) provides, in part, that if the defendant is determined to be a career offender under U.S.S.G. § 4B1.1, then the Guideline sentence shall be determined under U.S.S.G. § 4B1.1(c).  As noted above, U.S.S.G.§ 4B1.1(c)(3) calls for a sentence of 360 months' to life imprisonment.  Thus, due to the combined operation of the convictions on Counts One and Two, the applicable sentencing guidelines sentence for those two counts is 360 months' to life imprisonment.

13

use, attempted use, or threatened use of physical force against the person of another" and, as such, is a "violent felony" under 18 U.S.C. § 924(e)(2)(B).  Likewise, the defendant's January 25, 1994 Sale of Hallucinogens/Narcotics conviction is a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A).  Furthermore, as set forth in the Government's August 19, 2009 submission to this Court in this matter, the defendant's June 10, 1984 conviction for Robbery in the 3rd Degree[3] in violation of Conn. Gen. Stat. § 53a-136 necessarily involved "the use . . . or threatened use of physical force against the person of another" and is therefore a "violent felony" under 18 U.S.C. § 924(e)(2)(B).  As an armed career criminal and in accordance with U.S.S.G. §§ 4B1.4 and 4B1.1, the PSR correctly determined that the defendant's guideline imprisonment range was 360 months to life.

In Savage, the Second Circuit held, for the first time, that a violation of Conn. Gen. Stat. § 21a-277(a) could not be considered to be a categorical controlled substance offense because of subtle differences between the Connecticut statute and its federal counterpart.  See id., 542 F.3d at 965.  Therefore, for convictions under § 21a-277(a), under the modified categorical approach, the Government would have to present underlying court documents to establish that they qualified as controlled substance offenses.  See id. at 966.

The petitioner argues that he should benefit from the Second Circuit's decision in Savage and that he should not have been determined to be a "career offender" or an "armed career criminal."  The Savage decision, however, does not apply retroactively to cases on collateral

---

[3]Unlike the Sentencing Guidelines, the Armed Career Criminal Act places no limit on the age of qualifying prior convictions.  See, e.g., United States v. Paul, 156 F.3d 403, 404-05 (2d Cir. 1998) (holding that "there is no temporary restriction on the convictions that may be taken into account in determining whether a defendant is an armed career criminal (ACC) pursuant to § 924(d)").

14

review.  As Savage only enunciated a new rule of criminal procedure by which an advisory

sentencing range under the guidelines is calculated, retroactive application of Savage is barred by

Teague v. Lane, 489 U.S. 288 (1989).

In Teague, the Supreme Court held that when a decision announces a new rule of criminal

procedure, the rule is not applicable to cases that became final before the decision. 489 U.S. at

310-311.  The Supreme Court reasoned that retroactive "application of constitutional rules not in

existence at the time a conviction became final seriously undermines the principle of finality

which is essential to the operation of our criminal justice system." 489 U.S. at 309.  Accordingly,

the "new rule" principle of Teague "validates reasonable, good faith interpretations of existing

precedents made by [lower] courts even though they are shown to be contrary to later decisions."

Butler v. McKellar, 494 U.S. 407, 414 (1990).

"Under Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality

opinion), a case announces a new rule when it breaks new ground or imposes a new obligation on

the States or the Federal Government, . . . or if the result was not dictated by precedent existing at

the time the defendant's conviction became final." Coleman v. United States, 329 F.3d 77, 82

(2d Cir. 2003) (internal quotation marks and citations omitted).  "In Stringer v. Black, 503 U.S.

222, 228, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), the Court extended Teague's definition of a

'new rule' to include 'the application of an old rule in a manner that was not dictated by

precedent,' or, as we more recently stated, 'novel applications of old rules.'" Coleman, 329 F.3d

at 82 (citations omitted).  "In Santana-Madera v. United States, 260 F.3d 133 (2d Cir. 2001) . . . ,

we explained that whether or not a new rule of law announced by the Supreme Court is to be

applied retroactively in criminal cases on habeas review depends largely on whether the rule is

15

substantive or procedural." Coleman, 329 F.3d at 83 (internal quotation marks and brackets omitted).  "New substantive rules are applied retroactively on habeas review, but, with two narrow exceptions, new procedural rules are not." Id.

"When the Court announces a new substantive rule, it normally decides that a federal criminal statute does not reach . . . certain conduct." Coleman, 329 F.3d at 83 (internal quotation marks and citation omitted; emphasis in original).  "Because such decisions change the definition of what constitutes a crime, they necessarily carry a significant risk that a defendant stands convicted of an act that the law no longer makes criminal." Id. at 84 (internal quotation marks and brackets omitted).

"When the Court announces a new procedural rule, by contrast, it recognizes a constitutional right that typically applies to all crimes irrespective of the underlying conduct, and to all defendants irrespective of their innocence or guilt. Of course, such decisions may alter significant aspects of criminal proceedings, but they rarely influence the accurate determination of innocence or guilt." Coleman, 329 F.3d at 84 (internal quotation marks omitted; emphasis in original).  "There are two narrow exceptions to Teague's general bar against retroactive habeas relief for procedural errors." Id. at 88 (internal quotation marks omitted).  "Under Teague, new rules of constitutional criminal procedure do not apply retroactively on collateral review unless they fall into either of two categories: (1) new rules that place an entire category of primary conduct beyond the reach of the criminal law, or new rules that prohibit imposition of a certain type of punishment for a class of defendants because of their status or offense; or (2) new watershed rules of criminal procedure that are necessary to the fundamental fairness of the criminal proceeding." Id. (internal quotation marks omitted).

16

While the Government was unable to locate any cases directly addressing the retroactivity of <u>Savage</u>, the First Circuit Court of Appeals did address retroactivity in an analogous context. In <u>United States v. Giggey</u>, 551 F.3d 27 (1st Cir. 2008), the First Circuit reversed prior precedent and concluded that non-residential burglary under Maine law was not a "crime of violence" as that term is defined in the career offender provision of the sentencing guidelines.  Perhaps anticipating that its decision in <u>Giggey</u> might lead to a wave of 2255 claims by those who had been designated career offenders as a result of predicate non-residential burglaries under then-existing law, the First Circuit was careful to note that:

> our decision to change course affects only the procedure by which a district court calculates a defendant's sentence.  It does not prohibit criminal punishment for certain types of primary conduct or forbid the imposition of certain categories of punishment for a particular class of defendants and so is not a retroactive substantive change in the law.  It is also not a watershed change in the law any more than *United States v. Booker*, 543 U.S. 220 (2005), 125 S. Ct. 738 (2005), which we held non-retroactive.

551 F.3d at 36 (internal quotations and citations omitted).

Similarly, <u>Savage</u> did no more than establish a new rule in the determination of a career offender (or armed career criminal) sentencing calculation.  <u>Savage</u> did not make any substantive change to the scope of criminal liability with respect to the statutes under which the defendant was convicted.  <u>Savage</u> did "not prohibit criminal punishment for certain types of primary conduct or forbid the imposition of certain categories of punishment for a particular class of defendants."  <u>See</u> <u>Giggey</u>, 551 F.3d at 36.  Nor did it create a "watershed" rule that is central to an accurate determination of the defendant's guilt or innocence of the charge to which he was convicted.  <u>See</u> <u>id</u>.  Accordingly, under <u>Teague</u>, <u>Savage</u> cannot be applied retroactively to relieve defendant of the burden of a career offender designation or an armed career criminal designation,

which were applicable under then-existing precedent.

In short, the decision in <u>Savage</u> announced a new procedural, not substantive, rule.  In addition, this new procedural rule does not fall into either of the <u>Teague</u> exceptions set forth above.  Thus, <u>Savage</u> cannot be applied retroactively to this case or any other cases on collateral review.  <u>See</u> <u>Guzman v. United States</u>, 404 F.3d at 140 (holding that the Supreme Court's decision in <u>Booker</u> does not apply retroactively to cases on collateral review); <u>Corey v. United States</u>, 221 Fed.Appx. 1, *1-*2 (1st Cir. 2007) (holding that the Supreme Court's decisions in <u>Shepard v. United States</u> and <u>Crawford v. Washington</u> do not apply retroactively to cases on collateral review).

### C.  The Petitioner's Trial Counsel Was Effective.

The petitioner claims that his trial counsel was ineffective for failing to challenge that his Risk of Injury to a Minor conviction was a "crime of violence" under U.S.S.G. § 4B1.2(a) and his Sale of Hallucinogens/Narcotics convictions were "controlled substances offenses" under U.S.S.G. § 4B1.2(b).  Essentially, he argues that his defense counsel should have anticipated the Second Circuit's decision in <u>Savage</u>.  His counsel's failure to do so, however, does not constitute ineffective assistance.  "[I]n making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law."  <u>Sistrunk v. Vaughn</u>, 96 F.3d 666, 670 (3rd Cir. 1996); <u>see also</u> <u>Honeycutt v. Mahoney</u>, 698 F.2d 213, 216-17 (4th Cir.1983) (holding that failure to anticipate change in law "foreshadowed by" Supreme Court and federal appellate court precedent not ineffective assistance); <u>United States v. Fields</u>, 565 F.3d 290, 296 (5th Cir. 2009) (stating, "The overwhelming majority of circuits to address the issue have suggested that defense

counsel's failure to anticipate, in the wake of <u>Apprendi</u>, the rulings in <u>Blakely</u> and <u>Booker</u> does not render counsel constitutionally ineffective.").

> **D.      The Defendant's Guideline Calculation In The Event That**
> **He Was Not A Career Offender Or An Armed Career Criminal.**

Assuming *arguendo* that <u>Savage</u> could be applied retroactively to cases on collateral review and the Court were to employ the post-<u>Savage</u> procedure for determining whether a defendant was a "career offender" pursuant to U.S.S.G. § 4B1.1 or an "armed career criminal" pursuant to 18 U.S.C. § 924(e), it appears that the defendant would be neither a career offender or an armed career criminal.  As discussed in the Government's August 19, 2009 submission, the transcript of the defendant's January 25, 1994 conviction for Possession with Intent to Sell Narcotics demonstrates that this conviction is a "controlled substance offense" under U.S.S.G. § 4B1.2(a) and, likewise, a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A).  Further, as discussed above, the defendant's June 10, 1984 conviction for Robbery in the 3rd Degree is a "violent felony" under 18 U.S.C. § 924(e)(2)(B).  Because of the time limitations under U.S.S.G. § 4A1.2(e), however, it does not appear that this conviction constitutes a "crime of violence" for purposes of determining whether the defendant is a career offender.[4]  <u>See</u> U.S.S.G. § 4B1.2(c).

Finally, as noted in the Government's August 19, 2009 submission, it does not appear that the Government can prove, under the new post-<u>Savage</u> procedure, that: (1) the defendant's January 2, 1992 conviction for Sale of Hallucinogens/Narcotics was a "controlled substance offense" under U.S.S.G. § 4B1.2(b) or a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A); or (2) the defendant's August 11, 1988 conviction for Risk of Injury to a Minor was a "crime of

---

[4]As noted above, the Armed Career Criminal Act, unlike the Sentencing Guidelines, places no limit on the age of qualifying prior convictions.  <u>See, e.g.</u>, <u>Paul</u>, 156 F.3d at 404-05.

violence" under U.S.S.G. § 4B1.2(a) or a "violent felony" under 18 U.S.C. § 924(e)(2)(B).  It is theoretically possible, for example, that the defendant's January 2, 1992 conviction for Sale of Hallucinogens/Narcotics involved benzylfentanyl or thenylfentanyl, two obscure drugs that appear on the Connecticut, but not the federal, drug schedules.  Likewise, even though the PSR included unobjected-to facts demonstrating that the defendant's August 11, 1988 conviction for Risk of Injury to a Minor necessarily involved "the use . . . or threatened use of physical force against the person of another," the Government is unable to make this showing under the post-Savage procedure because of the State of Connecticut Judicial Branch's destruction of records.  Specifically, on October 1, 1999, the State of Connecticut Judicial Branch ordered the destruction of all official records of judicial proceedings taken by a court report (including transcripts of such proceedings) for proceedings that occurred prior to October 1, 1992.

In the event that Savage could be applied retroactively to cases on collateral review and it was determined that the defendant was not a "career offender" or an "armed career criminal," the defendant's guideline range would be calculated as follows:  The base offense level for the defendant's conviction in Count One for a Hobbs Act Robbery, in violation of 18 U.S.C. § 1951, is 20.  See U.S.S.G. § 2B3.1.  Two levels are added because the Harstan's employees were physically restrained (see U.S.S.G. § 2B3.1(b)(4)) and three levels are added because the loss exceeded $250,000 (see U.S.S.G. § 2B3.1(b)(7)), which results in an adjusted offense level of 25.  The PSR correctly determined that the defendant had 13 criminal history points, which places the defendant in Criminal History Category VI.  See PSR ¶ 45.  An offense level of 25 with Criminal

History Category VI results in a guideline range of 110 to 137 months' imprisonment.[5]  A

consecutive sentence of 84 months for Count Two (i.e., Using and Carrying a Firearm During

and in Relation to a Crime of Violence) pursuant to 18 U.S.C. § 924(c)(1)(A)(ii) and U.S.S.G.

§ 5G1.2 results in a sentencing range of 194 to 221 months.

## III.  **CONCLUSION**

For the reasons set forth herein, the petitioner's motion to vacate, set aside and correct his

sentence should be denied.


Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

*/s/ Geoffrey M. Stone*
GEOFFREY M. STONE
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct25326
450 Main Street
Hartford, Connecticut  06103
Telephone (860) 947-1101

---

[5]With respect to Count Three (i.e., Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)), the base offense level is 20 because the defendant committed the offense after sustaining a felony conviction for a controlled substance offense and four levels are added because the defendant possessed the firearm in connection with another felony offense, which results in an adjusted offense level of 24.  An offense level of 24 with Criminal History Category VI results in a guideline range of 100 to 120 months' imprisonment.

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2010, I caused a copy of the foregoing memorandum to be deposited in the mail for delivery to the following:

Kevin Carter
Prisoner No. 15587-014
FCI Fairton
P.O. Box 420
Fairton, NJ 08320

*/s/ Geoffrey M. Stone*
_____
GEOFFREY M. STONE
ASSISTANT UNITED STATES ATTORNEY